

FILED
JUN 21 2024
CLERK, U.S. DISTRICT COURT
DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                      PLAINTIFF

VS.                          Case **CV24-03727**

JOHN DOE, d.b.a. CREETOSIS

YOUTUBE, LLC                                      DEFENDANTS          *LB*



## COMPLAINT

Comes now, pro se Plaintiff David Stebbins, who hereby submits the following Complaint for five (5) counts of copyright infringement, two (2) counts of libel, one (1) count of intentional infliction of emotional distress, and one (1) count of civil conspiracy.

### I – PARTIES TO THE CASE

1.    I am a YouTuber and Twitch streamer who goes by the alias "Acerthorn." My YouTube channel can be found at the URL of **www.youtube.com/@acerthorn**, and my Twitch channel can be found at the URL of **www.twitch.tv/acerthorn**.

2.    Defendant YouTube LLC is the owner and operator of the eponymous website, www.youtube.com. It is headquartered in the city of San Bruno, CA and can be served with process at the following registered agent:

> Corporation Service Company
> 2710 Gateway Oaks Dr.,
> Suite 150N
> Sacramento, CA 95833

3.    Defendant John Doe is a YouTuber who goes by the alias "Creetosis." He has three YouTube channels which can be viewed at the URLs of **www.youtube.com/@Creetosis**, **www.youtube.com/@creetosisstreams**, and **www.youtube.com/@CreetosisBackup**. I do not know his legal name and address[1], but he is a member of the YouTube Partner Program, so YouTube will have that information on file about him. He can be served with process once I learn his legal name and address from YouTube during limited discovery.

---

1    For what it's worth, I *think* he lives in Canada.

## II – JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction under the "federal question" doctrine because it concerns cases of copyright infringement. The Court has supplemental jurisdiction to adjudicate the harassment and defamation claims. This Court has personal jurisdiction because one of the co-defendants (YouTube LLC) is headquartered in this district. Venue is also therefore proper in this district. The Court likewise has long-arm jurisdiction over the John Doe defendant in as much as his actions are also related to this case.

## III – RELATED CASES

5.      There are a few cases currently pending in this district that the Court may find to be related to this one. Those case's case numbers, the names of the parties, and a brief description of why the Court may consider them related are outlined below:

(a)      Case 3:22-cv-00546-JSW (Stebbins v. Rebolo) (short name: "the Rebolo case"). Creetosis is a co-defendant in that case as well, and in fact, his stream "STAG #6" is also being adjudicated in that case, albeit for a different copyrighted work. The harassment, doxxing, death threats, and cyberstalking that I describe in Dkt. 32, ¶¶ 53-140 are all hereby incorporated by reference. I would have included claims for IIED and defamation in the Rebolo case, except that Judge White, in Dkt. 30, forbade me from including any new claims.

(b)      Case 4:23-cv-00321-DMR (Stebbins v. Doe) (short name: "the SidAlpha case"). This is a defamation lawsuit against the John Doe defendant who goes by the alias "SidAlpha" on YouTube. This case is related because (A) the slander that SidAlpha published about me was a continuation of the IIED that Creetosis also participated in, and (B) the injuries I suffered in Dkt. 1, ¶¶ 132-41 in that case are more-less the same injuries I am seeking to recover here.

(c)      Case 3:24-cv-00398-LJC (Stebbins v. Baz) (short name: "the Baz case"). Baz also posted several videos infringing on my copyrights. What makes this case independently worth including is the fact that both Baz and Creetosis followed more-less the same pattern when it comes to their response videos (playing 100% of my videos in their entirety, every single last second of them, while occasionally pausing to give commentary). As such, both cases are likely identical in merit when it comes to the issue of fair use. I see no good reason

Complaint

why one defendant should be considered fair use while the other isn't. Either both are, or both aren't. For what it's worth, in that case, the Court has already acknowledged that the copyright infringement claims are valid, so that acknowledgement should carry over here. See Dkt. 13, Page 3, Lines 14-15 ("The Court finds no basis for dismissal of Stebbins's copyright infringement claims and would allow those claims to proceed"). See also Dkt. 16, Page 5, Lines 17-18 ("The undersigned does not recommend dismissing or striking Stebbins's copyright infringement claims").

## IV – FACTS OF THE CASE

6.      The following facts are necessary to understand this case.

### IV-1: My original copyrighted works

7.      I own the copyrights to the following works:

#### IV-1-A: The video "Morrowind Retrospective – Why Morrowind is Overrated"

8.      On November 25, 2018, I posted a video of my own creation to my YouTube channel called "Morrowind Retrospective – Why Morrowind is Overrated." For simplicity's sake, I will refer to that video as "the Morrowind video" for the rest of this complaint.

9.      This video contains minimum creative spark because it consists predominately of me giving my opinions about the video game "The Elder Scrolls III: Morrowind." Opinions constitute minimum creativity. Therefore, this video is eligible for copyright protection. I registered the copyright for this video. The registration number for this copyright is Pau004190174.

#### IV-1-B: Acerthorn Channel Icon #6

10.      Starting in May 2019, and going until December 2021, I used an icon of my own creation for my YouTube channel which I have named "Acerthorn Channel Icon #6," so named because it was the sixth icon that I used for that channel. The icon mostly consists of my username "Acerthorn" overlaying a blue poly vector background, which gives it minimum creative spark. The copyright registration number for this icon is VA0002294009.

#### IV-1-C: The video "Dark Souls Retrospective – Dark Souls Sucks, and Here's Why"

11.      On January 14, 2020, I posted a video of my own creation to my YouTube channel called "Dark Souls Retrospective – Dark Souls Sucks, and Here's Why." For simplicity's sake, I will

Complaint

refer to this video as "the Dark Souls video" for the rest of this complaint. It has minimum creative spark for the same reason the Morrowind video has minimum creative spark.

12.     I registered the copyright for this video on December 6, 2021. The copyright registration number for this video is PA0002343781.

### IV-1-D: The video "Elden Ring Sucks, and Here's Why"

13.     On March 23, 2022, I posted a video of my own creation to my YouTube channel called "Elden Ring Sucks, and Here's Why." For simplicity's sake, I will refer to this video as "the Elden Ring video" for the rest of this complaint. It has minimum creative spark for the same reason the Morrowind and Dark Souls videos have minimum creative spark.

14.     I registered the copyright for this video on July 20, 2023. The copyright registration number for this video is PAu004190174.

### IV-1-E: The video "Maybe YOU'RE the ones ducking ME!"

15.     On May 16, 2022, I posted a video of my own creation to my YouTube channel called "Maybe YOU'RE the ones ducking ME!" For simplicity's sake, I will refer to this video as "the Ducking video" for the rest of this complaint.

16.     This video was dedicated to discussing real-life events that I was experiencing at the time, rather than video games. However, it still consists predominately of my opinions, and therefore contains minimum creative spark for the same reasons as the other videos do. The copyright registration number for this video is PAu004190174.

### IV-1-F: All five of these works are officially unpublished.

17.     It is also worth noting that all four videos, and the icon, all fit the legal definition of "unpublished." This is because they were only ever published on YouTube. A work is not considered "published" simply because it is posted online. This is established by "Circular 66," which is published by the US Copyright Office and is entitled to deference pursuant to Chevron v. Nat. Res. Def. Council, 467 U.S. 837 (1984). You can find that document at the following URL: **https://www.copyright.gov/circs/circ66.pdf**

18.     On pages 4-5 of that circular, it says in pertinent part …

> "The fact that a work has been placed online or posted on a website does not necessarily mean that the work has been published. The Office considers a work

published when copies of it are distributed to the public by sale or other transfer
of ownership if the copyright owner authorizes the end user to retain copies of the
work. ***Merely displaying or performing a work online generally does not
constitute publication.*** ... ***Just because an end user can technically reproduce a
work does not necessarily mean that the work has been published.*** A copyright
owner must have expressly or implicitly authorized users to make ***retainable
copies*** of a work by downloading, printing, or other means for the work to be
considered published.

The concepts of authorization and publication can be complicated and may have
serious consequences for the author or copyright owner. For this reason, ***the
Office generally lets the applicant decide whether a particular work is published
or unpublished.*** In making this determination, you may wish to consider the
following general guidelines.

• Work made available only by streaming. ***Streaming is a performance***, which, in
and of itself, ***does not constitute publication***, because, as a practical matter, the
end user does not retain a copy of the work when the performance ends.

• Work for which downloading or reproduction is expressly prohibited. ***If there is
a notice on a website in the terms of service for the site or another obvious
place indicating that a work or the content on the site cannot be downloaded,
printed, or copied, the work or content may be deemed unpublished***, because the
end user is not authorized to download, print, or otherwise distribute copies.
...

• Work made available through an implied license. ***It may be unclear*** whether the
copyright owner authorized the public to retain copies of the work if a work is
posted on a website and there is no evident statement in the terms of service for
the site—on the web page where the work is displayed or elsewhere—stating that
the work can be downloaded, copied, forwarded, shared, or printed."

19.    Important sections of that excerpt were bolded and italicized for emphasis.

20.    Applying these rules to the instant case, none of the copyrighted works in question here
qualify as "published." They are merely "performed" on my YouTube channel, not licsensed or
sold. There was no option to download these works for offline viewing, except by third party me-
ans. YouTube expressly forbids downloading any videos except through the methods they them-
selves provide[2], nor have I hosted any of these videos on any other services besides YouTube, so

---

2    See `https://www.youtube.com/t/terms:(`

"The following restrictions apply to your use of the Service. You are not allowed to:
1. access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise
use any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior
written permission from YouTube and, if applicable, the respective rights holders"

there is no way I posted it to any website which explicitly authorizes third party downloading.

21.    The closest you could get to having these streams be considered "published" is by pointing out that YouTube allows members of its "YouTube Premium" service to download videos for offline viewing. See `https://www.youtube.com/premium` ("Downloads Save videos for when you really need them – like when you're on a plane or commuting"). However, that still doesn't count. These so-called "downloads" are only viewable within the YouTube mobile app and, most importantly of all, are automatically deleted after a few days, because they aren't meant as a substitute for downloading of videos to get around copyright. It is meant for commuters and such, who are only without Internet for a few hours, or 1-2 days at most.

22.    In other words, the existence of YouTube Premium's download feature does not constitute publication of YouTube videos because the videos downloaded using that feature are not "retainable." As shown above, that was an essential element in whether or not posting something on a website constitutes publication.

23.    Even if YouTube premium downloads were classified as "retainable," the fact that they can only be viewed within the YouTube mobile app means that the original infringer in this case could not possibly have used that method to create his infringing series, so it still doesn't count.

24.    The only way you can download videos off of YouTube in a way that is both retainable, and expressly authorized by the service, is if you were logged into the channel's account and download them from your YouTube Analytics page. Since the individual infringer in this case obviously cannot claim to have gotten any of my videos using that method, the videos are therefore legally classified as "unpublished" for purposes of this case.

25.    However, even if my understanding of the word "retainable" is wrong, it ultimately doesn't matter. Bear in mind that Circular 66 says that "it is unclear" whether this counts as a "publication." Earlier in that excerpt, they also stated that, whenever it is ambiguous, ***the copyright owner gets to decide*** whether it is published or unpublished! This means that the burden falls to the defendant to prove, not just that I am wrong about this, but that I am objectively unreasonable in forming my belief. If there is any ambiguity in the facts, my preference is entitled deference. Therefore, the videos and icon are still legally classified as

Complaint

"unpublished" and there's no two ways about it.

### IV-2: The infringements

26.    Defendant Creetosis has a series on his YouTube channel called "STAG," which initially stood for "Suffering Through Abject Garbage," but the acronym was later changed to mean "Some Tangents Are Guaranteed." It is a reaction series, where the defendant and 3-4 rotating co-hosts watch a YouTube video together and react to it. The playlist for the series can be viewed at the following URL:

`https://www.youtube.com/playlist?list=PL2ih7fSoY4eSJ1vkGjCCZPDbrepE1-U6o`

27.    You won't find any of the streams where he reacted to my videos in that playlist, but that is only because, after I issued two copyright strikes against him, he immediately took down all of the videos on his channel that were about me. He reposted some (but not all) of the videos to his CreetosisBackup channel, none of which I'm suing over today.

28.    While reacting, they publicly play 100% of the videos they react to, literally every single last second of them, while only occasionally stopping to give criticism or commentary. Creetosis, along with countless other YouTubers, have this delusional belief that, as long as they provide a token amount of criticism of someone's video, there is a 100% chance that their response videos are fair use, no ifs ands or buts, and therefore they are entitled to copy literally 100% of the original video and completely displace the market for the original.

29.    Even the commentary Creetosis and his co-hosts do provide often fails to meet the legal definition of "transformative" under copyright law. As I mentioned earlier, Creetosis eventually changed the name of his series to mean "Some Tangents Are Guaranteed." By skimming over the aforementioned playlist, you will find countless instances in each video where he and his co-hosts stop talking about the videos they're reacting to in order to go off on these namesake "tangents" and talk about whatever suits their fancy. That, however, does not meet the legal definition of "transformative." See Dr. Seuss Enterprises, LP v. COMICMIX LLC, 983 F. 3d 443, 453-54 (9th Cir. 2020) ("Boldly's claim to transformative use rests on the fact that it has "extensive new content." But the addition of new expression to an existing work is not a get-out-of-jail-free card that renders the use of the original transformative. The new expression must be accompanied by the benchmarks of transformative use"). Also, as famous lawyer-turned-

YouTuber Devin "LegalEagle" Stone explains ...

> "Generally speaking, in copyright law, you have to comment and criticize the
> actual clip itself. You can't use the clip to comment on something else. That's kind
> of the difference between parody and satire. Parody comments on the underlying
> work, satire comments on something else. Parody is fair use, often, but satire is
> almost never fair use."
> See `www.youtube.com/watch?v=5A_i-sB9H0Q` (timestamp 13:07 – 13:25)

30.    To be clear, the Defendant and his co-hosts still have the right, under the First Amend-
ment, to have these tangents. Unlike the monetization of their streams or the fact that they use
100% of the original videos, these tangents do not *weigh against* fair use. But they don't bolster
the Defendant's claim to transformative use either. Rather, when analyzing these videos for fair
use, the "tangents" will have to be tossed out entirely and given no consideration whatsoever.

31.    This, of course, will require the Court to know which portions of the reaction videos are
dedicated to reacting to my videos and which portions are irrelevant tangents that need to be ign-
ored for purposes of fair use. This means that, once the case gets underway, either the Defendants
or the Court[3] will have to meticulously and painstakingly go through each sentence of his multi-
hour-long streams, one sentence at a time (like picking individual grains of rice out of a
swimming pool) and justify each individual sentence as being aimed at the video they're reacting
to. This is sure to be an arduous task indeed, but it's one the Defendant brought on himself.

32.    With that said, let us now discuss the individual reaction videos that I'm suing over today.

### IV-2-A: Infringement #1 – STAG #6 – The Morrowind Reaction

33.    On September 12, 2021, Creetosis did a live stream known as "STAG #6: 'Morrowind
Retrospective - Why Morrowind is Overrated' & 'Fallout: New Vegas Retrospective.'" I will refer
to it as "the Morrowind Reaction" for simplicity's sake. If the video were still publicly visible, it
could be viewed at the following url:

**`https://www.youtube.com/watch?v=gagv7c-CD-U`**

34.    As alluded to earlier, Creetosis played 100% of my Morrowind video, literally every sin-
gle last second of it. While he occasionally stopped to give criticism, most of his original comm-

---

3    I certainly have no intention of doing this. After all, not only has the Ninth Circuit "unequivocally placed the
burden of proof on the proponent of the affirmative defense of fair use," but they have held that this is one of the
few "absolute statements" when it comes to fair use. See Seuss, supra at 459.

Complaint

entary was on those aforementioned tangents. For example (and this is *just one* example; there are hundreds of examples just like this in this stream alone), at timestamp 4:35 – 7:45, he provides original commentary, but only 4:35 – 4:59 and 5:14 – 6:19 are actually directed at the clip he was reacting to. Meanwhile, timestamps 4:59 – 5:14 and 6:19 – 7:45 was spent giving criticism on a previous video he had reacted to, then tuting his own horn, then notifying his viewers about his unreliable Internet connection, and then more praising of another YouTuber's review of the game that had nothing to do with the video he was actually reacting to at the moment. All of these segments must be tossed out when considering fair use.

35.    Even when he provided commentary directly pertaining to the video he was reacting to, his commentary is the very definition of "threadbare." All he really gave was his subjective opinion about the alleged tastelessness of my opening line in the Morrowind video. His opinion was not purported to be based on any expertise (e.g. he doesn't claim to be a psychiatrist or anything that might give him credentials regarding online interpersonal interactions), but instead just gives his entirely unsubstantiated layman opinion. He doesn't even give any real facts or arguments in support of his opinion. While this technically counts as transformative, it is only the most minimal, bare bones version of transformative.

36.    The stream was undoubtedly a commercial endeavor. For example, at timestamp 2:20:12, you can see evidence of a $10 "super chat" (chat messages with monetary donations attached to them) in the live chat feed. Even discounting the super chats, Creetosis almost certainly enabled ads on the video, which also qualifies as commercial use.

37.    This video remained publicly visible up until September of 2023. As a result, the "continuing violations" rule effectively tolls the statute of limitations, so that the 2-year statute of limitations begins to run on that date.

IV-2-B: Infringement #2 – The Dark Souls Reaction

38.    On March 21, 2022, Creetosis posted a stream called "STAG #34: Arrival? -- Covering Acerthorn's Absurdly Terrible Dark Souls 'Retrospective.'" I will refer to it as "the Dark Souls Reaction" for simplicity's sake. If the stream were still publicly visible, it could be viewed at the following URL:

-9-

Complaint

`https://www.youtube.com/watch?v=M9qg-EH4B3s`

39.     Once again, Creetosis copied 100% of my Dark Souls video, literally every single last second of it. Once again, he frequently goes off on unrelated tangents and talks about whatever suits his fancy, which is not transformative. Once again, he monetized the video with super chats and ads. For example, at timestamp 1:06:23, if you look in the live chat replay, you can see records of a $100 super chat that someone gave him while this stream was broadcasting live.

40.     On Aug. 24, 2023, I submitted a DMCA Takedown Notice to YouTube. During this notice, however, I inadvertently listed the Morrowind video as the original, copyrighted video that was infringed upon, rather than the Dark Souls video. That wasn't fraud; that was an honest mistake. There's a big difference. I immediately noticed my mistake and replied to YouTube's email, acknowledging my mistake and asking for them to correct it for me.

41.     On Sept. 4, 2023, YouTube sent me an email, asking me to clarify whether or not I had considered fair use. I replied, not only once again clarifying that the original copyrighted video of mine that this video infringed upon was the Dark Souls video, not the Morrowind video, but also providing an analysis of fair use similar to the one I will provide in Section V-2 of this Complaint down below.

42.     On Sept. 6, 2023, YouTube, apparently satisfied with my explanation about how it is not fair use, removed the video and issued Creetosis a copyright strike. However, my copyright takedown log in my YouTube analytics section, they still listed the Morrowind video, rather than the Dark Souls video, as the video that was infringed upon. Because of this, Creetosis and his other followers[4] have publicly accused me of DMCA fraud.

<h3 style="text-align:center">IV-2-C: Infringement #3A – The Elden Ring Reaction</h3>

43.     On March 23, 2022, Creetosis posted a livesteam called "COPE -- SEETHE -- MALD (Acerthorn Crying About Elden Ring)." I will refer to it as "the Elden Ring Reaction" for simplicity's sake. While not officially part of the STAG series, this was, effectively, a STAG stream in everything but name. Specifically, he reacted to my Elden Ring video. If the video were still up, it could be viewed at the following URL:

---

4  Such as Trysten Burg, co-defendant in 3:22-cv-00546-JSW (Stebbins v. Rebolo), who accused me of fraud at 2:58 of this video: `https://youtu.be/132okXWjXfQ?t=178`

**www.youtube.com/watch?v=_PTKmJExF7s**

44.    Once again, he plays the entirety of my Elden Ring video, literally every last second of it. Once again, he commercializes that video with ads and super chats. For example, at timestamp 28:55, you can see a $5 super chat in the live chat feed. Once again, his original content is majority unrelated tangents that fail to meet the legal definition of transformative.

45.    On Sept. 5, 2023, I submitted a DMCA Takedown Request against this video. This time, I listed the correct original copyrighted video in the takedown notice. On Sept. 6, 2023, YouTube once again asked me to confirm that I had considered fair use. I replied giving a similar explanation to what I am about to provide in Section V-2 of this Complaint below. Therefore, on Sept. 7, 2023, YouTube, apparently satisfied with the explanation that I gave that proves that the video isn't fair use, removed the video and issued Creetosis a second copyright strike.

### IV-2-D: Infringement #3B: Reposting the Elden Ring Reaction

46.    On or around September 15, 2023, Creetosis simply reposted the Elden Ring Reaction. Although the original version had been taken down, he decided to simply repost it. He changed nothing in the video before reposting it, made no effort whatsoever to better comply with fair use. If the video were still publicly visible, it could be viewed at the following URL:

**https://www.youtube.com/watch?v=FzBVXURXaOw**

47.    On November 5, 2023, I noticed he had shamelessly reposted the video and issued another DMCA Takedown against it. YouTube eventually took it down, although I do not know exactly what date it was removed, since I never got an email notification stating it had been removed. Bear in mind that this gave Creetosis his third copyright strike within three months, so he should have had his channel terminated, but it wasn't.

48.    The fact that he reposted this stream so shamelessly is relevant for two reasons. First, it means that the latest infringement occurred in September of 2023, rather than March of 2022, which is relevant for determining whether I am eligible for statutory damages under 17 USC § 412. Also, in my opinion, the fact that he chose to simply repost the video, rather than go through the proper channels and issue a DMCA Counter-Notification in order to fight the takedown, means that he should lose whatever affirmative defenses (including fair use) he might otherwise have had.

Complaint

49.    Think about it this way: Imagine if you are banned from a brick & mortar business, and you believe the ban was discriminatory (e.g. it was done on account of your religion or your real or perceived disability). But because you feel that filing a discrimination lawsuit in federal court is not worth your time or money, you proceed to simply put on a disguise and re-enter the business. Well, as a matter of law, not only is the illegitimacy of your ban not going to be an affirmative defense to your new trespass charge, but even if you eventually decide to file a discrimination claim afterwards, your claim of discrimination will at that point be foreclosed to you, even if you might have had a legitimate discrimination claim in the first place. Too late, you should have gone through the proper channels from the outset.

50.    The same logic applies here: If Creetosis believed his infringements were fair use, he should have gone through the proper channels from the outset, not simply reposted the infringements in an attempt to force me to re-issue redundant DMCA Takedowns on videos I had already taken down. For this reason, Creetosis's claim to fair use (as well as any other affirmative defense he may have) should be stricken, at least in regards to the Elden Ring Reaction, under a combination of unclean hands, res judicata, collateral estoppel, laches, and the equitable principle of "vigilantibus non dormientibus aequitas subvenit."

### IV-2-E: Infringement #4 – The Ducking Reaction

51.    From May 18 through May 25, 2022, Creetosis posted a four-part series on his channel called "Morning Roast" where he did a four-part reaction to my Ducking video. I will refer to this 4-part series as "the Ducking Reaction" for simplicity's sake. If the videos were still publicly visible, they could be viewed at the following URLs:

    (a)    Part 1: **https://www.youtube.com/watch?v=X6oSbgPitQ4**

    (b)    Part 2: **https://www.youtube.com/watch?v=hzF8q1NXn7g**

    (c)    Part 3: **https://www.youtube.com/watch?v=etenf1aJKFA**

    (d)    Part 4: **https://www.youtube.com/watch?v=dKN8ivNC8BI**

52.    Across all four parts, Creetosis once again played 100% of my Ducking video, literally every single last second of it. Once again, his commentary majority consisted of unrelated tangents that don't meet the legal definition of transformative. Once again, he commercialized all

four videos with ads and super chats. For example, in Part 2, at timestamp 21:10, you can see a $5 super chat in the live chat replay.

53.    On September 6, 2023, I submitted a DMCA Takedown request against the entire four-part series. However, Creetosis deleted these videos (as well as every other video on his channel that was about me) before YouTube had enough time to process the takedown request.

IV-2-F: Infringement #5 – The Icon Display

54.    On December 5, 2021, Creetosis posted a stream called "STAG #19: "The Fallout Fandom Rant" + Hatred of Jacobstown." This is the one livestream that Creetosis still has up to this day. You can view it at the following URL: **www.youtube.com/watch?v=rkrirf8Ie90**

55.    The majority of the stream wasn't about me. However, at timestamp 1:20:43 – 1:22:38, an imposter Acerthorn appeared in the Defendant's chat and posted a message. This was not my account, but an imposter. This imposter used my copyrighted "Acerthorn Channel Icon #6" as part of his imposter account. This means that, when he posted his message, the icon also appeared in Creetosis's stream, which is an infringement of my legal monopoly under 17 USC § 601(5) "to display the [pictorial or graphic] work publicly."

56.    Since the message was not in any way, shape, or form meant to criticize me or my channel, that means that this message was not the least bit fair use. Perhaps, if he was not only pretending to be me, but also making statements that would sound farcical to the average person, you could make the argument that the imposter is criticizing me through impersonation. But this man was merely wishing everyone a happy holidays. That's not criticism or commentary. Therefore, it's not fair use.

57.    Although, at timestamp 1:22:20, a moderator removed the *message*, the icon remained up. Meanwhile, Creetosis never edited that part of his stream out, despite having more than two years to do so. As a result, he is also liable for the icon appearing in his stream.

58.    On September 15, 2023, I issued a DMCA Takedown requesting that the video be removed. If this video were removed pursuant to this takedown, it would have given Creetosis a third copyright strike and his channel would have been subject to termination if he hadn't issued a counter notification. However, on November 16, 2023, after two months of back and forth discus-

-13-                                                                    Complaint

sions, YouTube sent me an email stating that they weren't going to remove the video. YouTube has therefore lost safe harbor and has become vicariously liable for this count of infringement.

### IV-3: Creetosis's Public Response and his Backup Channel

59.     After Creetosis removed all of the videos about me from his main channel, on or around September 11, 2023, Creetosis made a community post where he publicly insulted and berated me for issuing the DMCA Takedowns I had issued. This community post can be found at the following URL: **www.youtube.com/post/Ugkx1QGs3MFJNCPeGDnyrEOfKXIpnwVsdGy2**

60.     Of particular relevance to the instant case are the following excerpts:

(a)     "[M]y videos and streams are 100% fair use."

(b)     "he [meaning I] certainly wants to 'punish' me for criticizing him."

(c)     "While all those videos and streams are fair use, I didn't want to risk losing the entire channel because YouTube automatically grants DMCAs if the forms are filled out well enough regardless of actual merit, of which there is none here."

61.     All of these statements are lies. First, as I am about to explain in Section V-2 of this Complaint, the streams that I issued takedowns of are not fair use. Furthermore, as I am about to explain in *this* section, there is a high probability that he even knows this, and is simply lying.

62.     Second, his accusation that I simply want to "punish him for criticizing me" is absurd. This is something that every one of my haters over the past few years has whipped out whenever it is convenient for them, but it contradicts literally every piece of evidence out there, as well as basic common sense. In fact, if you actually stop to think about the implications of this accusation, it makes no sense whatsoever.

63.     Think about it: Most people freely acknowledge that I have been harassed and doxxed to no end, and that Creetosis is party to a great chunk of this harassment. See Case 3:22-cv-00546-JSW (Stebbins v. Rebolo), Dkt. 32 (Second Amended Complaint), ¶¶ 52-140 for more details. The harassment, doxxing, and stalking I endured caused me so much stress that I came down with a case of pneumonia so severe that it could have killed me and ended up hospitalizing me for eight whole days. See Case 4:23-cv-00321-DMR (Stebbins v. SidAlpha), Dkt. 1, ¶¶ 132-141 for more details. Bear in mind that nobody denies that any of this occurred. Many insist that it is

not relevant to copyright law, but nearly everyone admits that it's true.

64.     So when Creetosis (and many others like him) say that I'm just trying to "punish him for criticizing me," what he's actually saying is ... I don't actually care about any of that other blatantly illegal and blatantly malum in se stuff. All the harassment, all the doxxing, all the stalking (both cyberstalking and in person stalking), all the defamation, all the hospitalization, and all the copyright infringement that isn't fair use ... I would actually be totally fine with all of that, as long as the criticism – and *only the criticism* – wasn't part of it!

65.     When you look at it that way, the accusation that I'm just trying to silence First Amendment-protected criticism quickly becomes ludicrous on its face, doesn't it?

66.     As for the claim that YouTube automatically processes any DMCA Takedowns that are properly filled out regardless of merit, this is, again, a bald-faced lie. As I explained earlier in this Complaint, YouTube did indeed vet my DMCA Takedowns and ask me to explain that they are not fair use. Only after I gave them satisfactory arguments to show that the streams are not fair use, then and only then did YouTube remove the videos as I requested.

67.     Of Course, Creetosis's subsequent actions demonstrate, not just that he's wrong about these things, but that he most likely *knows* he's wrong.

68.     On September 13, 2023, he created a new channel called "Creetosis Backup." There, he reposted some (but not all) of the videos about me that he took down. To this day, he has not posted any videos on that channel that weren't about me. However, when you look at all the videos he chose to repost and compare them to the ones that he didn't repost, a rather telling pattern starts to emerge. Namely, he did not repost any of the livestream reaction videos that I am suing over today. Instead, he only reposted various videos where he simply gave his opinions about me while occasionally providing some screenshots (which are often taken out of the proper context and are lying by omission) in order to corroborate his opinions about me. You know ... like *fair use?!* Highly defamatory fair use, but still fair use regardless!

69.     Think about that for a minute: He saw that I was going through his channel and striking his videos, so he took down all the videos that were about me. He then proceeds to repost the videos that actually have a nonfrivolous (although still not surefire) case for fair use, while

leaving out the ones whose case for fair use is a long shot in the best case scenario, while still publicly insisting that *all* of his videos (not just the ones he reposted) were "100% fair use." Furthermore, he claims that I will simply issue DMCA Takedowns against any videos, regardless of fair use, and that YouTube will take them down "regardless of actual merit" (those were his exact words), so by that logic, what's to stop me from also taking down the videos he reposted?!

70.     There's an old saying: "Actions speak louder than words." Here, what Creetosis is saying, and what he is doing, are completely at odds with one another. His actions demonstrate that even he doesn't believe, deep down inside, that his reaction streams are fair use. When he says his streams "are 100% fair use," he isn't simply mistaken about the law; he's *lying!*

71.     This will be useful in increasing the statutory damages that he is liable for up to $150,000 per infringement.

### IV-4: Creetosis's conspiracy with others to harass, dox, and cyberstalk me, and his personal contributions to same

72.     First, as I mentioned earlier, the contents of Dkt. 32, ¶¶ 53-140 of the Rebolo case are hereby incorporated by reference. However, there are a few clarifications I need to make. None of these clarifications mean I was lying in the Second Amended Complaint in the Rebolo case, just that I was misinformed at the time.

73.     In ¶ 112 of that Second Amended Complaint, I mistakenly claimed that Creetosis's discord server "used to" have a thread dedicated to harassing, doxxing, and cyberstalking me, known as the "Acerthorn Pinata Bashing" thread (or APB for short). As it turns out, the thread is still active and being posted in, even to this day. I only didn't see it at the time of the Second Amended Complaint because the thread is hidden behind a level cap.

(a)     Discord has various bots that server owners can use to make the functioning of their servers easier and more streamlined. One function that these bots can do is keep track of each person's activity within the server, assign "experience points" to each user based on their activity, and cause them to "level up" accordingly, much like in a video game.

(b)     The server owner is able to gate off individual perks, privileges, and even entire chat rooms based on level. For example, a server owner may restrict the ability to post video file

Complaint

attachments in the server until the individual user levels up.

(c)    In Creetosis's discord server, access to the ACP chat room is blocked off to level 0 users. To gain access to that chat room, you must participate in the rest of the server enough that you obtain at least Level 1.

74.    This is an important clarification to make because the fact that the ACP thread still exists means that all the harassment, doxxing, and cyberstalking that goes on inside it, as well as the stochastic terrorism it facilitates outside that chat room such as that which I described in ¶ 113 of that Second Amended Complaint thereof, is itself still ongoing and perpetual. This, in turn, means there is no statute of limitations for the IIED and civil conspiracy claims. The statute of limitations begins to count down immediately after the *most recent* act which constitutes the tort. Because the most recent acts are happening as we speak, the statute of limitations never began running in the first place, which means I can recover for all acts which fall under the IIED tort, even those specific acts that occurred more than two years ago.

75.    The second clarification I wish to provide is that Creetosis was indeed an active participant in all the harassment, doxxing, and cyberstalking that the group of people I am currently in litigation with (including Baz, SidAlpha, Rebolo, and all the individual defendants in the Rebolo and Polano cases) had conducted about me. He didn't simply create the ACP thread in his Discord server and then allow everyone else to participate in it; he actively participated in the harassment and doxxing himself.

76.    One example the Court can see with its own two eyes is an old stream that was reposted on the "Creetosis Backup" channel after he removed all references to me from his main channel. Specifically, I am referring to the video titled "Morning Roast #1: Corpo Lawyers BTFO Stabbins." At timestamp 0:35 of that video, Creetosis shows a forum post that is over a decade old, that has nothing at all to do with the legal dispute he was seeking to ridicule me over, just for the sole purpose of publicly shaming, humiliating, and pillorying me. The majority of that video was dedicated to analyzing my at-the-time current standing in the Polano case, but this opening segment did not in any way, shape, or form tie into any of that.

77.    Remember, in Dkt. 32, ¶¶ 57-72 of the Rebolo case, I made a clear distinction between

Complaint

criticism (which is protected under the First Amendment) and harassment (which is a crime in every state). There is a big difference between engaging in hostile, standoffish behavior where your opponent may feel harassed but which you are doing for a legitimate purpose (such as debt collection phone calls) versus a course of conduct designed *solely to harass*. That is the essential factor that makes something harassment.

78.     Well here, Creetosis pulled up a decade-old forum post for the sole purpose of bullying me. It was effectively the online equivalent of a bully in school getting ahold of his victim's diary and reading several pages out loud for the sole purpose of tormenting and humiliating his victim.

79.     In addition to this, he also actively participated in the scheme to get SidAlpha to publish his smear video about me, which I am currently suing for in the SidAlpha case. He, along with several others, went to SidAlpha and gave him their highly skewered and lie-filled side of the story. In doing so, Creetosis personally participated in the civil conspiracy to have me be harassed, doxxed, and cyberstalked.

### IV-5: Injuries I suffered as a result of the harassment, doxxing, cyberstalking, cyberbullying, and defamation

80.     All the harassment, doxxing, cyberstalking, cyberbullying, and defamation that I have sustained over the years at the hands of Creetosis and his co-conspirators ultimately caused me to come down with a life-threatening case of pnuemonia. Had I not been insured, the hospital bills for that sickness would easily have been over a million dollars, and if I had not gotten medical treatment, I could easily have died. See Dkt. 1, ¶¶ 132-141 of the SidAlpha case for more details.

### V: LEGAL ARGUMENTS

81.     For the reasons set forth below, I am entitled to recover for copyright infringement.

### V-1: Copyright Infringement

82.     "There are only two elements necessary to the plaintiff's case in an infringement action: ownership of the copyright by the plaintiff and copying by the defendant." See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1151 (9th Cir. 1986).

83.     Sections IV-1-A through IV-1-E of this Complaint sufficiently allege the first essential element (ownership of copyright by Plaintiff) for each of the five counts of infringement.

84.     Meanwhile, Section IV-2 of this Complaint sufficiently alleges the second essential element (copying by the defendant) for all five counts of infringement.

85.     Therefore, to the surprise of hopefully no one, I have a case for copyright infringement unless the underlying videos are fair use. I hope I say at least that much without any controversy. The issue of fair use is sure to be much more hotly contested, but the prima facie case of copyright infringement in the first instance should hopefully be largely undisputed.

### V-2: Fair Use

86.     The Defendants are most likely to raise fair use as their primary defense. For the reasons set forth below, the defense should not apply. Please note that, although I am offering to refute the claim to fair use in the Complaint, I am not required to do so at this stage. See Peterman v. Republican National Committee, 320 F. Supp. 3d 1151, 1157 (MT 2018) ("[I]t is not necessary to plead facts that disprove fair use to survive a Rule 12(b)(6) motion to dismiss"). The fact that I am offering to make a token argument here is a courtesy, not a requirement.

### V-2-A: Infringement #5

87.     First, I'd like to point out that fair use is only even available as a defense in regards to the first four counts of infringement. For the fifth count – where an imposter Acerthorn's chat message caused my copyrighted channel icon to appear in Creetosis's stream – no fair use defense is even applicable. The imposter did not use my channel for any fair use purpose. He simply wished everyone a happy holidays, but he could have done that while using any icon.

88.     Creetosis clearly knew about the icon being there. As I pointed out earlier, either he, or one of his mods working under his direction, removed the message. Therefore, it stands to reason that he also knew that my copyrighted icon was also appearing in his stream. Admittedly, there was nothing he could have done at first to prevent the icon from appearing in the stream (it was a live broadcast, after all), but once the stream had ended, the video suddenly became viewable and rewatchable the same as any other video. From there, Creetosis could very easily have simply cropped out that portion of the stream, using YouTube's own built-in video editing features. A demonstration of that feature can be found at the following URL:

`https://www.youtube.com/watch?v=VIiq32OdgpY`

89.     Creetosis had well over a year to remove the infringement from his video. He chose not to. Therefore, he is liable, as is YouTube for their failure to remove it.

### V-2-B: Factor #1A: Criticism & Commentary

90.     For the infringements where the defendants are at least eligible to raise the fair use defense, we must remember that not every second where Creetosis and his co-hosts provide original content meets the legal definition of "transformative." As I said earlier, the majority of his original content is just him and his co-hosts talking about whatever, but not actually tying it into the videos they're reacting to. As I said earlier, if the Defendants still wish to press their case for transformative use, they will have to systematically go through every single sentence, one sentence at a time, for all four of their reaction videos except STAG #19 (like picking individual grains of rice out of four different swimming pools) and categorize each and every sentence as either being directed towards the video they're reacting to, or unrelated and therefore not transformative.

91.     But even then, the Defendant's job still isn't done. After all, not all transformative value is created equal. "[T]he first factor asks 'whether *and to what extent*[5] the use at issue has a purpose or character different from the original... A use that has a further purpose or different character is said to be 'transformative,' but that too is a matter of degree." See Andy Warhol Foundation Visual Arts v. Goldsmith, 143 S. Ct. 1258, 1262 (2023).

92.     So once Creetosis has properly separated his original content as outlined above, he must then take the content that is categorized as transformative, and further separate it into two subcategories: Content which is genuinely insightful and genuinely offers new insights and understandings, and content where he does little more than state whether or not he agrees with the opinions I express in the original video without giving anything deeper than that. The latter should only be considered "nominally transformative," and therefore carry significantly less weight in the overall fair use analysis than the former. Ten minutes of merely disagreeing with my opinions without going any deeper than that should be the equivalent of one minute of genuinely insightful and genuinely profound criticism and analysis, in terms of overall transformative value.

93.     For example, in the excerpt I gave above when discussing STAG #6 (the reaction stream

5   Emphasis in original

to my Morrowind video), I mentioned how timestamps 4:35 – 4:59 and 5:14 – 6:19 could fit the criteria to be transformative. However, that excerpt only depicts Creetosis and his co-hosts merely finding distasteful the fact that I acknowledged that many people will disagree with my opinion and they should be prepared to unsubscribe from my channel in protest. He gave the opinion that this would only start things off on the wrong foot when it comes to encouraging people to give my video a fair shake. That's it. That's all he does. He does not purport to base this prediction off of any expertise or anything other than his personal and arbitrary tastes.

94.    Therefore, it should only be considered the bare minimum transformative value, which carries significantly less weight in fair use proceedings than the genuinely profound criticism or commentary that constitutes "new information, new aesthetics, new insights and understand-ings"[6] which creates the ideal case for fair use.

95.    Creetosis likely didn't even *attempt* to give anything more profound than him merely disagreeing with my opinions for the same reason he didn't even *attempt* to comply with the third and fourth factors of fair use: Because he delusionally believes that, as long as he provides even a nonzero amount of any criticism whatsoever, no matter how threadbare, he is guaranteed to be entitled to fair use, to the exclusion of all other factors. If he provides even one sentence of criticism, that gives him carte blanche to repost the entire video, and any additional content he may provide, or any portions of my video he may cut out, is only a bonus, not legally required, and anyone who even tries to contest that belief is merely a thin-skinned snowflake who just can't take criticism. Of course, that's not how fair use actually works, but a lot of people (Creetosis included) seem to believe it.

### V-2-C: Factor #1B: Commercialization

96.    As mentioned above, all five of these streams are undeniably commercial in nature. Creetosis clearly monetized all of these streams with ads and super chats. Therefore, the streams are commercial uses of my copyrighted videos.

97.    Overall, Monge v. Maya Magazines, Inc., 688 F. 3d 1164 (9th Cir. 2012) is most instruc-tive here: "[The Defendant's] minimal transformation of the [original work] is substantially undercut by its undisputed commercial use. On balance, the first factor is at best neutral, and

6   See Andy Warhol, supra at 1282.

-21-                                                    Complaint

does not support [the Defendant]'s claim of fair use." See id at 1177 (citations omitted).

V-2-D: Factor #2: Nature of the Copyrighted Work

98.     First, as I explained in Section IV-1-F above, the videos and icon are all unpublished. This automatically means that the second factor of fair use must weigh against the defendant, regardless of the level of creativity in the original work. See Monge, supra at 1177-78 (holding that the "unpublished" sub-factor outweighs the "nonfiction" sub-factor).

99.     However, even if the Court disagrees with my interpretation of Circular 66 and insists that the videos and icon are all published, the second factor must still weigh against fair use because the videos qualify as "highly creative." Those videos are dominated by my opinions, not statements of cast-iron objective fact. Therefore, the second factor should weigh against fair use. See Cambridge University Press v. Patton, 769 F. 3d 1232, 1270 (11th Cir. 2014):

> "[W]e find that the District Court erred in holding that the second factor favored fair use... Where the excerpts of Plaintiffs' works contained evaluative, analytical, or subjectively descriptive material... or derives from the author's experiences or opinions, the District Court should have held that the second factor... weighed against fair use in cases of excerpts that were dominated by such material."

100.    Therefore, whether the works are unpublished or whether the works are highly creative, the second factor weighs against fair use.

V-2-E: Factor #3: Amount & Substantiality of the Portion Used

101.    In all instances that I am suing over in this case, the Defendant copied 100% of the original videos, literally every single last second of them. This is an egregious violation of the third factor of fair use. In fact, it used to be the precedent in the 9th Circuit that, whenever a secondary user copied the entirety of the original work, that precluded fair use in its entirety. See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1155 (9th Cir. 1986).

102.    Although that is no longer the case, the 9th Circuit has nonetheless held that using the entirety of the original work still means that the third factor weighs against fair use as a matter of course, without the district courts being afforded any discretion in this regard. See Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F. 3d 1110, 1118 (9th Cir. 2000) (citing Hustler, supra at 1155). While it is theoretically possible to still get fair use overall while copying

-22-                                        Complaint

100% of the original work, the district court must still find the third factor to weigh against fair use as a matter of binding precedent.

### V-2-F: Factor #4: Effect on the Market

103.    "This last factor is undoubtedly the single most important element of fair use." See De Fontbrune v. Wofsy, 39 F. 4th 1214, 1226 (9th Cir. 2022) (citing Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539 (1985)). Moreover, it is the one factor that has been expressly affirmed by the Supreme Court as being singularly capable of negating fair use in its entirety, all on its own. "[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work." See Monge, supra at 1182 (emphasis in original). "If the defendant's work adversely affects the value of any of the rights in the copyrighted work … the use is not fair." Harper & Row at 568.

104.    It is also important to note that the defendant necessarily holds the burden of proof on this issue. See Dr. Seuss v. Comicmix, 983 F. 3d 443 (9th Cir. 2020), which unequivocally calls upon the defendant, "as the proponent of the affirmative defense of fair use," to "bring forward favorable evidence about relevant markets," and stating that this is one of the few "absolute statements" when it comes to fair use. See id at 458-60.

105.    I am not required to allege market harm in the Complaint. See Peterman v. Republican National Committee, 320 F. Supp. 3d 1151, 1157 (MT 2018) ("[I]t is not necessary to plead facts that disprove fair use to survive a Rule 12(b)(6) motion to dismiss"). The fact that I am offering to make a token argument here is a courtesy, not a requirement.

106.    That being said, Ceetosis has copied the entirety of my Morrowind, Dark Souls, Elden Ring, and Ducking videos, literally every single last second of all of them.

107.    This constitutes a market substitute, per se.

(a)    See Hustler Magazine v. Moral Majority, 796 F. 2d 1148, 1154 (9th Cir. 1986):

"[B]y copying all or substantially all of the copyrighted work, the distinction of function vanishes since whatever the intent of the copier, a verbatim reproduction will of necessity serve the function of the plaintiff's work as well as that of the defendant's."

(b)    See also Cambridge University Press v. Patton, 769 F. 3d 1232, 1271 (11th Cir. 2014):

Complaint

"A book reviewer who copies snippets of a book is likely to increase the demand for the book, but were a book reviewer to quote the entire book in his review… he would be cutting into the publisher's market, and the defense of fair use would fail."

(c)    See also Consumers Union of US v. General Signal, 724 F. 2d 1044, 1051 (2nd 1983):

"The fourth fair use factor will come into play if too much is copied or if the entire plot is revealed, thereby usurping the demand for the original work."

(d)    See also "YouTube's Copyright System Isn't Broke; the World's Is"[7] by Tom Scott (timestamp 19:18 − 20:22):

"Mystery Science Theater was absolutely criticism and review, and absolutely transformative, but they still licensed the movies … because yeah, playing someone else's entire movie, just with wisecracks over it? Probably not fair use!"

(e)    See also Devin "LegalEagle" Stone's video documentary "YouTuber Extortion? MxR Plays v. Jukin - Real Law Review"[8] (timestamp 14:31 − 15:18):

"[B]y showing those clips in full to the audience … it's entirely possible that you might not watch the [original] videos because you saw, basically, the whole thing in [the defendant]'s videos."

(f)    See also Devin "LegalEagle" Stone's video documentary "xQc Is Stealing Content (and So Are Most Reaction Streamers)"[9]  (timestamp 23:01 − 23:16):

"So yes, you could add some original commentary to your reaction, but if it completely displaces the market for the original, it's probably not fair use. And it's pretty obvious that once you see a video during a livestream, the way that most of these livestreamers do it, you're not gonna go back and watch the whole video again."

108.    Therefore, if the Defendant wishes to argue fair use, he has some heavy lifting to do when it comes to proving a lack of market substitute.

V-2-G: Concluding Fair Use

109.    In conclusion, we have three of the four factors weighing definitively against fair use, with one factor (the first factor) being an extremely borderline case, given how few and far

---

7  https://www.youtube.com/watch?v=1Jwo5qc78QU
8  https://www.youtube.com/watch?v=5A_i-sB9H0Q
9  https://www.youtube.com/watch?v=um9aGTAU0lg

between the criticism actually is, and how undeniably commercial the videos are. See Monge v. Maya Magazines, Inc., 688 F. 3d 1164, 1177 (9th Cir. 2012) ("[The Defendant's] minimal transformation of the [original work] is substantially undercut by its undisputed commercial use. On balance, the first factor is at best neutral, and does not support [the Defendant]'s claim of fair use") (citations omitted).

110.    With 3½ factors weighing against Creetosis as a matter of course, that leaves criticism as his last bastion of hope for obtaining fair use on the first four counts of infringement. However, with 3½ factors weighing against him right out of the gate, then unless the criticism he provides is *__absolute gold__* – not just giving dissenting opinions or calling me an idiot, but extremely profound, downright philosophical commentary, the kind that *Confucius himself* would tip his hat to – then his case for fair use is effectively dead on arrival.

111.    Contrary to common misconception, the addition of a nonzero amount of criticism, no matter how few and far between, does not automatically guarantee that your video is fair use, to the exclusion of all other factors. This is the misconception that Creetosis and many other YouTubers just like him fall victim to, but that is not actually how the law works. See Dr. Seuss Enterprises, LP v. COMICMIX LLC, 983 F. 3d 443, 452 (9th Cir. 2020) (citing Monge at 1173) ("While the analysis of … fair use … may be guided by the examples given in the preamble to § 107, i.e., criticism, comment …not even these works compel a per se finding of fair use") (citations and quotations omitted).

112.    Therefore, the claim for fair use which the Defendant is sure to attempt to raise in this case must fail.

### V-3: DMCA Safe Harbor

113.    Even if YouTube has safe harbor, or may otherwise prevail on the that count of infringement, it still would result in YouTube LLC being dismissed as a party to this case in its entirety. The statute of 17 USC § 512 specifically states that its safe harbor provisions do not apply to the injunctive relief spoken of in subsection (j). The phrase "except as provided in subsection (j)" appears no less than four times throughout the statute. Therefore, even if YouTube has safe harbor or otherwise prevails on the merits on that count of infringement, they can still be

Complaint

liable for the injunctive relief I am requesting in VI-2-A of this Complaint.

114.     That said, YouTube has lost its safe harbor when they refused in writing to remove STAG #19 or any portion thereof. They are now vicariously liable for the infringement, the same as Creetosis is.

115.     Barring that, we must remember that Creetosis has already gotten three copyright strikes within three months: One for Section IV-2-B, one for Section IV-2-C, and one for Section IV-2-D where he shamelessly reposted the Elden Ring Reaction rather than going through the proper channels and counter-notifying the original DMCA Takedown. Despite getting three copyright strikes within three months, Creetosis's accounts have not been terminated like YouTube's DMCA Policy says they should.

116.     Therefore, YouTube has lost its safe harbor generally for failing to "reasonably implement" their own DMCA policy in compliance with 17 USC § 512(i)(1)(A). See In re Aimster Copyright Litigation, 252 F. Supp. 2d 634 (D.C. Ill. 2002) (holding that having de jure adoption of a facially valid policy without de facto reasonable implementation of same is grounds for a loss of safe harbor).

117.     But of course, even if the Court decides that they are eligible for safe harbor, they can still be held liable for the injunctive relief specified in 17 USC § 512(j) anyway.

### V-4: Libel

118.     Creetosis has spent the past few years constantly defaming me at nearly every turn. But there are just two counts of libel that I wish to sue for today. To commit defamation (whether spoken/slander or written/libel), the Plaintiff must show (1) the Defendant made a statement of fact (or at gave an assertion that implies a    statement of fact) (2) the statement was published to at least one third party, (3) the statement is false, and (4) the statement has a natural tendency to harm or causes special damage. See Taus v. Loftus, 54 Cal.Rptr.3d 775, 804 (2007).

119.     The community post Creetosis published on or around September 11, 2023 contains at least two (possibly more) statements that fit the above criteria.

120.     First, since that community post was and still is publicly visible, that easily satisfies the second essential element: That it was published to at least one third party.

Complaint

121.    The two statements I wish to sue over today are the following:

(a)    "he certainly wants to 'punish' me for criticizing him"

(b)    "YouTube automatically grants DMCAs if the forms are filled out well enough regardless of actual merit, of which there is none here."

122.    The first of these two statements is a direct statement of my subjective motives for issuing the DMCA Takedowns. The second statement implies another statement of fact: That I intentionally and maliciously exploited YouTube's policy of "automatically grant[ing] DMCAs if the forms are filled out well enough regardless of actual merit" in order to illegally get Creetosis's videos taken down.

123.    In the Baz case, Magistrate Judge Cisneros stated that the use of the word "seems" in the defendant's statement automatically, and to the exclusion of all other factors, renders his statement a non-actionable opinion "whether or not [the Defendant]'s conclusions were correct, or even reasonable." See Dkt. 16. I of course disagree with that logic, for reasons I have already made clear in Dkt. 17 of that case, but for the time being, I bring that up to say this: Even by that preposterous standard that has no basis in the law, Creetosis's statements here still count as statements of objective fact. He did not say "I think he just wants to punish me for criticizing him," like in the case of Hosseinzadeh v. Klein, 276 F. Supp. 3d 34, 47 (SD NY 2017). He is saying that I "certainly" just want to punish him for criticizing me. This makes it clear that he is intending to make a statement of cast-iron objective fact. Meanwhile, he didn't say "it seems as if YouTube automatically grants any DMCA regardless of actual merit." He outright said that this is, in fact, what YouTube does, and in doing so, implied that I knew this as well and knowingly exploited that. Therefore, both statements are statements of fact.

124.    Both statements are provably false. As to YouTube's habit of automatically removing content regardless of merit, YouTube, in these instances, did indeed request that I demonstrate that I considered fair use. Only when I presented them with arguments similar to those given in Section V-2 of this Complaint, then and only then did YouTube remove the videos in question.

125.    The statement about me "just" seeking to punish him for criticizing me is also easily disproven, on the grounds that it already makes absolutely no sense in the first place. The

Defendant is not saying that I'm silencing criticism in the process of protecting my valid legal rights (aka the Doctrine of Double Effect[10]), nor is he accusing me of seeking to silence criticism _as well as_ protect my copyright and/or stop harassment. He's accusing me of acting with the sole, exclusive motive of silencing criticism, and absolutely nothing else. Silencing criticism is not simply 0.1% or 99.9% of my agenda, but literally 100% of it. Bear in mind that both the Defendants and the District Court freely admit that I am being harassed and doxxed by numerous individuals. I don't even have to prove those things because the Defendants admit they are true.

126.    So when the Defendants say that I am merely attempting to silence criticism, what they're actually saying is ... I don't actually care about any of that! All the harassment, all of the doxxing, and all of the copyright infringement that isn't fair use, would all be water under the bridge, from my point of view, as long as the criticism, and _only the criticism_, was not part of it!

127.    When you look at it that way, Defendant's accusation against me quickly becomes ludicrous on its face.

128.    Therefore, the third essential element for libel has been satisfactorily pled.

129.    As to the fourth essential element, these statements constitute defamation per se. Specifically, they portray me as being unfit for my profession of YouTube content creator, while also accusing me of breaking the law, specifically of violating 17 USC § 512(f).

130.    In addition to that, these two statements are only the most recent in a years-long defamation campaign against me that Creetosis has participated in. I will discuss the legalities of Civil Conspiracy in Section V-6 below, but for the time being, I ask the Court to accept that Creetosis is part of it. Anyway, these two statements effectively reset the statute of limitations for libel, but now that the statute of limitations has been reset, he can be held liable for all the injuries I suffered which he contributed to, even those injuries which occurred more than one year ago.

131.    As I explain in Section IV-5 above (including the portions of the SidAlpha case which were incorporated by reference into that section), the injuries I suffered as a result of all the harassment and stochastic terrorism that resulted from Creetosis's & others' defamation had the

---

10 Originally coined by philosopher Thomas Aquinas, the Doctrine of Double Effect means there sometimes are unfortunate consequences that we simply cannot avoid if we are to obtain the result we truly desire. See https://youtube.com/clip/Ugkxou7wY2dlbXQeTSn0WvlFfZnUg7MLZjjy for one example of this.

Complaint

potential to be lethal (see Section V-6 below). That certainly qualifies as "special damage" for purposes of a defamation claim. So the fourth and final essential element for libel is satisfied.

132.    Therefore, the essential elements for libel have been sufficiently plead.

### V-5: Intentional Infliction of Emotional Distress

133.    To state a claim for intentional infliction of emotional distress (or IIED for short), the Plaintiff must show (1) extreme and outrageous conduct by the defendant with the intention to cause, or reckless disregard of the probability of causing, emotional distress; (2) the Plaintiff suffered of severe or extreme emotional distress that no humane person should be expected to endure; and (3) actual and proximate causation of the emotional distress. Meanwhile, See Hughes v. Pair, 46 Cal. 4th 1035, 1050 (2009).

134.    A Defendant's conduct is considered outrageous if it is "so extreme as to exceed all bounds of that usually tolerated in a civilized community." Meanwhile, "[s]evere emotional distress means emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." See id at 1051.

135.    The factual allegations of Sections IV-3 and IV-4 sufficiently plead the first essential element. While I freely concede that the specific allegations mentioned in those sections (such as reacting to a decade-old forum post, and creating the "Acerthorn Pinata Bashing" thread) alone do not rise to the level needed to be actionable IIED, we must also remember that the contents of the Rebolo Case, Dkt. 32, ¶¶ 52-140 have been incorporated by reference at the start of Section IV-4. All of the harassment outlined in those incorporated paragraphs, collectively, do indeed amount to conduct "so extreme as to exceed all bounds of that usually tolerated in a civilized community." The specific allegations mentioned in Sections IV-3 and IV-4 above are merely designed to show that Creetosis contributed a non-nominal portion of this harassment, and conspired with others to persuade SidAlpha to make his smear video about me. This establishes the elements for civil conspiracy (see Section V-6 below for more details), which makes him jointly liable for all the torts committed against me in furtherance of this group effort, even those which he did not personally commit, just like how the driver of a getaway car is just as legally liable for the entire robbery (and anyone harmed during the commission of it) as the others who

Complaint

personally handled the money and threatened people with guns.

136.    Likewise, Creetosis here is just as liable for the entirety of all the harassment, doxxing, stalking, and bullying that has come my way these past few years as the likes of SidAlpha and InitiativeKookie, even for the specific acts he did not personally participate in.

137.    As to the requirement that the outrageous conduct must be done "with the intention to cause, or reckless disregard of the probability of causing, emotional distress," that too is also sufficiently plead. Again, I incorporated by reference ¶¶ 52-140 of the Second Amended Complaint in the Rebolo case. That means that I incorporated by reference the following excerpt:

> "On August 20, 2022, InitiativeKookie began talking to me on Discord without realizing that it was me. During this conversation, he confessed in writing that he had no legitimate motive for all the harassment and doxxing he was engaging in. He did it solely because he was a malicious bully. Bear in mind, this is not simply him failing to give any legitimate motive for his actions; he actively admitted to not having one!" See Case 4:22-cv-00546-JSW, Dkt. 32, ¶ 110.

138.    Because Creetosis is jointly liable because he participated in the civil conspiracy (see Section V-6 below), that means he's jointly liable for furthering InitiativeKookie's agenda. Therefore, this element is sufficiently pled.

139.    The second essential element has also been sufficiently plead thanks to the allegations in Section IV-5 above (which also incorporated by reference the relevant portions of the complaint in the SidAlpha case). The emotional distress that I have suffered must be so severe that no reasonable person should be expected to endure it. Here, the emotional distress I suffered *could have killed me!* Even without physical assault, I still could have died as a result of the harassment I suffered, not because I was so depressed that I tried to kill myself (I was certainly depressed from the harassment, but not to the point of suicidal ideation). Rather, the pnuemonia is what nearly killed me, and that was caused by a weakening of my immune system, which was itself caused by chronic psychological stress, which was itself the direct result of the harassment.

140.    So the emotional distress I endured was "of such substantial quality or enduring quantity" that it was almost fatal. If *literal near death* does not qualify as something "that no reasonable [person] in civilized society should be expected to endure," then nothing does.

141.    In fact, the case of Hughes v. Pair, which I cited above, already indicates that putting a

Complaint

plaintiff in reasonable fear of death is sufficient to constitute the tort. See Hughes, id at 1051 (citing Kiseskey v. Carpenters' Trust for So. California (1983) 144 Cal.App.3d 222, 229-230 [192 Cal.Rptr. 492]) ("threats of harm or death to plaintiff and his family for failure to sign new union agreement sufficiently 'outrageous'").

142.    As to the third and final essential element – causal connection between the first two elements – that is also sufficiently plead in Section IV-5. When I incorporated by reference certain portions of the complaint in the SidAlpha case, that included the following excerpt:

> "On May 3, 2022, one week after I was discharged from the hospital, I returned to Dr. Jaggers' clinic and got my stitches taken out. There, I took that opportunity to ask him about whether the harassment I have endured as a result of the smear video might have been what actually caused this pneumonia. He admitted that this was indeed the most likely cause."
> See Case 4:23-cv-00321-DMR (Stebbins v. SidAlpha), Dkt. 1, ¶ 138.

143.    Therefore, the essential elements for IIED have been sufficiently plead.

### V-6: Civil Conspiracy to Commit Libel and IIED

144.    "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors." See Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 869 P. 2d 454, 510-11 (1994). "As long as two or more persons agree to perform a wrongful act, the law places civil liability for the resulting damage on *all* of them, regardless of whether they actually commit the tort themselves." See Wyatt v. Union Mortgage Co., 24 Cal.3d 773, 784 (1979) (emphasis in original).

145.    "To support a conspiracy claim, a plaintiff must allege the following elements: (1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." See State ex rel. Edelweiss Fund, LLC v. JPMorgan Chase & Co., 90 Cal. App. 5th 1119, 1144 (2023).

146.    Here, the elements of civil conspiracy have been sufficiently plead to make Creetosis jointly liable for the libel and IIED, as well as the near-fatal damages I suffered as a result of

Complaint

these two torts.

147.    The first element – agreeing to commit the unlawful act – is established because Creetosis actively participated in the collaboration to attempt to smear me, first by spreading misinformation about me on his own channel and then by collaborating with my other haters to convince SidAlpha to make his own smear video about me.

148.    The second element – at least one overt act in furtherance thereof – is also established. Sections IV-3 and IV-4 of this Complaint outline at least a few of the overt acts that Creetosis himself personally took in order to make my life a living hell, as well as at least two libelous statements about me. These are not the only things that Creetosis himself personally did, but they are all I need to establish his participation in a civil conspiracy.

149.    The third element – damages arising from the conduct – is also established. I suffered stress severe enough to give me a life-threatening stress-related illness. That element is handily satisfied.

150.    Therefore, I have sufficiently plead the elements for civil conspiracy. Therefore, pursuant to the Applied Equipment and Wyatt precedents mentioned above, he is jointly liable for every single ounce of stress that the smear campaign against me has caused, even for the stress caused by overt acts he did not personally do.

## VI: RELIEF REQUESTED

151.    If I prevail on the merits in any of the aforementioned claims, I hereby request the following relief:

### VI-1: Damages

152.    First, I ask for statutory damages of $150,000 for each of the five counts of infringement. That comes out to a total of $750,000 against Creetosis. Since YouTube has lost its safe harbor generally, they should be jointly liable for these damages, and they should especially be jointly liable for the $150,000 in damages for Infringement #5.

153.    I am eligible for statutory damages because the works are all legally unpublished. As such, it doesn't matter if the infringements predate the registration. In fact, I can apply for registration *whenever I want*, and I would still be eligible for statutory damages. After all, any

Complaint

registration date is automatically "within three months after the first publication[11]" if *there is no first publication!*

154.    Barring that, the Dark Souls Reaction described in Section IV-2-B above, as well as Creetosis's reposting of the Elden Ring Reaction as described in Section IV-2-D above, both occurred after their respective copyrights were registered[12]. So with those two counts of infringement, I am eligible to recover statutory damages either way.

155.    For the torts of libel and IIED, I ask the Court to award me compensatory damages of $1,000,000, as that is approximately what I would have had to pay in hospital bills if I were not insured. Therefore, it is an adequate representation of the emotional distress I suffered as a result of the IIED and defamation over the years.

156.    In the event that I am unable to recover statutory damages for any or all of my claims of copyright infringement, then I ask that the $1,000,000 in compensatory damages also be awarded to me as actual damages for the claims of copyright infringement. 17 USC § 504(b) does not limit actual damages only to purely economic lost revenues, so damages for emotional distress are plainly allowed.

157.    I also ask the Court to consider awarding punitive damages in addition to this in order to deter further conduct.

### VI-2: Injunctive Relief

158.    I also request the following injunctive relief:

### VI-2-A: Injunctive relief against YouTube

159.    I request that YouTube LLC be enjoined to ...

    (a)     remove all instances of infringement of my copyright from their website in its entirety, pursuant to 17 USC § 512(j)(1)(A)(i);

    (b)     permanently terminate Creetosis's accounts with with YouTube, pursuant to 17 USC § 512(j)(1)(A)(ii); and

    (c)     take whatever measures are necessary to prevent Creetosis from creating any new

---

11  17 USC § 412(2)

12  The Dark Souls video was registered on December of 2021 and the reaction happened on March of 2022. The Elden Ring video was registered in July 2023 and the reposting of the Elden Ring Reaction occurred in September of that year.

Complaint

accounts, pursuant to 17 USC § 512(j)(1)(A)(iii).

160.    Remember that I am still entitled to this injunctive relief, even if YouTube LLC has safe harbor regarding Infringement #5.

### VI-2-B: Injunctive relief against Creetosis

161.    For Creetosis, I ask that he be enjoined to never again create any content which infringes on my copyright unless he first obtains a "declaration of noninfringement" for the specific article he seeks to publish, either from the Copyright Claims Board or from a court of competent jurisdiction.

162.    This is, effectively, the defendant's equivalent to being declared a vexatious litigant. It's like an ex boyfriend getting a restraining order to have no further contact with his ex girlfriend without leave of court.

163.    The Court has the power to issue this injunction pursuant to 17 USC § 502(a), which grants district courts broad power to issue "injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." This grants the Court near limitless discretion, limited only by the Defendant's constitutional rights.

164.    For the tort of libel, I ask the Court to enjoin the Defendant to do two things:

165.    First, he should be enjoined to remove all instances of defamation against me from his YouTube channels and discord servers, that echo the same or substantially similar sentiments described in ¶ 113(a)-(b) above.

166.    In addition to that, I ask that he be ordered to publicly correct the statements he made about me in such a way that ensures that my reputation is fully restored. He should not be required simply to tell everyone that he was wrong, but to *actually convince them*, to the point where literally everyone on Earth, with no exceptions, has either never heard of this controversy in the first place, or their must subjectively believe that I am the blameless victim of harassment, doxxing, and defamation (and that Creetosis willingly and maliciously participated in same), and absolutely nothing else.

167.    Just like in the SidAlpha case, this means Creetosis should be held in contempt of court any time anyone, for any reason, posts any defamation about me that directly corresponds to the

Complaint

two statements mentioned in ¶ 116(a)-(b) above. If anyone is not personally convinced that those two statements are false, Creetosis has not fulfilled his obligations under this second injunction.

168.     For the intentional infliction of emotional distress tort, I ask the Court to order the Defendant to immediately cease and desist all harassment towards me of any kind, including but not limited to doxxing me, monitoring my activities (online and off) without independently good reason, and/or permitting anyone else to do the same on his YouTube channel or Discord server. An exception can exist if the harassment is for an entirely separate reason with an entirely independent origin from what Creetosis has harassed me over.

169.     I also ask the Court to enjoin the Defendant to, personally and by any means necessary, ensure the end to any/all harassment against me, not just the harassment that he has personally participated in. This includes removing, or seeing to the removal of, all instances of harassment, doxxing, etc. from the entire world wide Internet. Like the second defamation injunction above, this would mean that Creetosis should be held in contempt of court any time anyone harasses me in any way, shape, or form[13] over the subject-mater which Creetosis has participated in harassing me over. Harassment over a completely unrelated topic and had an entirely separate origin from the current controversy would not be covered.

170.     This would also require the Defendant to ensure that all unauthorized instances of my personal information are removed from the Internet in its entirety. I never consented to having my personal information published. It was never "public" until my haters (such as InitiativeKookie, with Creetosis following suit) posted them. Even if it was nominally public, it certainly wasn't widely disseminated until they started widely disseminating it. Moreover, they only posted this information, not for any legitimate purpose, but purely out of a desire to inflict as much pain on me as humanly possible, which, as I explain in Dkt. 32, ¶¶ 53-85 of the Rebolo case, is the *true* test of whether or not doxxing is harassment and therefore rises to the level of IIED.

171.     Therefore, as part of this injunction, Creetosis should be required to personally and by any means necessary see to the removal of any and all instances of my personal information

---

13 Remember: As I explained in Dkt. 32, ¶¶ 53-85 in the Rebolo case, harassment is *any* conduct – any whatsoever – as long as the conduct (A) has a reasonable tendency to cause harassment, annoyance, or alarm, and (B) the actor has no legitimate purpose behind the conduct except to make the victim suffer for its own sake.

Complaint

being posted online, and to be held in contempt of court until that happens.

### VI-3: Declaratory Relief

172.     I also ask that the Court issue declaratory judgments that Creetosis's actions were willful and malicious. This would have two effects: First, it would enable the Court to award statutory damages of up to $150,000 per infringement. Second, it would ensure that Creetosis cannot discharge this judgment in bankruptcy, pursuant to 11 USC § 523(a)(6).

### VI-4: Other Relief

173.     I also ask for any other relief the Court, in its discretion, feels I may be entitled to.

### VII: CONCLUSION

174.     Wherefore, premises considered, I respectfully pray that judgment be entered against the Defendants, costs incurred be awarded, and for any other relief to which I may be entitled.

So requested on this, the 17th day of June, 2024.

David Stebbins (pro se)
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
870-204-6516
acerthorno@yahoo.com

-36-                                                        Complaint